# St. Marys Sewer Pipe Company's Petition

298

*Jesse Long, Jr.*, for complainant.

*T. G. Gregory*, for respondent.

HIPPLE, P. J., August 28, 1945.—This matter comes before the court on the petition of St. Marys Sewer Pipe Company, hereinafter designated as company, for a review of the decision and final order of the Pennsylvania Labor Relations Board in a proceeding under the Pennsylvania Labor Relations Act of June 1, 1937, P. L. 1168, as amended by the Act of June 9, 1939, P. L. 293, 43 PS §211.1. In its decision and order the board found that 34 persons were "employes" of the company on September 20, 1938, and prior and subsequent thereto within the meaning of section 3, subsection (*d*) of the act; that the company was guilty of unfair practices within the meaning of section 6, subsections (*a*), (*c*), and (*e*), and further that all of the employes of the company, with the exception of the superintendent and check-weighman, have at all times constituted a unit appropriate for the purpose of collective bargaining within the meaning of section 7, sub-

section (a) of the act. The charge was filed with the board on December 12, 1938, by Harry Askey, Jr., an organizer for the United Mine Workers of America, District No. 2, hereinafter designated as union. A complaint issued on December 16, 1938, to which an answer was filed, and hearings were held before a trial examiner assigned for that purpose, commencing December 27, 1938, and closing January 5, 1939. The testimony taken before the trial examiner was transcribed and filed with the board, but the board made its own findings and entered a decision and order on February 7, 1940, which, after hearing on exceptions filed by the company thereto, was made final and absolute on April 21, 1941. This action gives rise to the petition for review. The board by its order directed the company to cease and desist from in any manner interfering with, restraining or coercing its employes working in the Weisner Mine in Ringgold Township, Jefferson County, Pa., in the exercise of their right to self-organization, to form, join or assist labor organizations, to bargain collectively through representatives of their choosing, and to engage in concerted activities for the purpose of collective bargaining, or other mutual aid or protection, as guaranteed in section 5 of the Pennsylvania Labor Relations Act; to cease and desist from in any manner discouraging membership in the labor organization known as the United Mine Workers of America, District No. 2, or any other labor organization, by discriminating against its employes in regard to hire, tenure, terms or conditions of employment; upon request to bargain collectively with the United Mine Workers of America, District No. 2, in respect to rates of pay, wages, hours and other conditions of employment for the employes assigned to the Weisner Mine, and to take affirmative action to effectuate the policies of the Pennsylvania Labor Relations Act by preparing and posting in conspicuous places readily accessible to its employes at the Weisner

Mine in Ringgold Township, Jefferson County, Pa., a preferential list of all employes assigned to this mine according to their seniority as of September 20, 1938, and including particularly therein the names of 30 persons who were found to be members of the United Mine Workers of America, District No. 2, on October 6, 1934; to offer immediate employment or reinstatement according to their positions on the preferential list to as many such employes as were members of the United Mine Workers of America, District No. 2, on September 20, 1938, as the condition of the company's work presently permits, to their former positions without prejudice to all rights and privileges previously enjoyed by them, dismissing or laying off, if necessary, any or all employes hired on or about September 20, 1938, and thereafter; and to offer employment or reinstatement to such employes as were members of the United Mine Workers of America, District No. 2, on September 20, 1938, according to their position on the preferential list and for whom employment might not be presently available, without prejudice to all rights and privileges previously enjoyed by them, when and as soon as such employment is available, and before hiring any other person or persons whose names do not appear on the preferential list.

When the complaint was filed and the testimony taken before the trial examiner, the Pennsylvania Labor Relations Act of June 1, 1937, sec. 9, subsec. (*b*), providing for a review by the court of common pleas of the action of the board, provided that "findings of the board as to the facts, if supported by evidence, shall in like manner be conclusive". By the amendment of June 9, 1939, P. L. 293, sec. 9, subsec. (*b*), of the act was amended in this respect by providing that "the findings of the board as to the facts, if supported by substantial and legally credible evidence, shall in like manner be conclusive".

In this case, the findings, decision and order of the board nisi, were not handed down until February 7, 1940, approximately eight months after the passage of the amendatory Act of 1939, which was effective as of the date of its enactment, and the exceptions filed by the company were likewise disposed of, and the final order of the board was made April 21, 1941, approximately one year and 10 months subsequent to the passage of the amendatory act. Therefore, while the case was under consideration by the board, the amendatory act was in effect providing that the findings should be based upon substantial and legally credible evidence.

This amendment of 1939 to the labor relations act refers to procedural matters only. It does not affect or disturb vested or substantive rights, and therefore must be applied to litigation existing at the time of the passage of the amendatory act: Kuca v. Lehigh Valley Coal Co., 268 Pa. 163; Seneca v. Yale & Towne Mfg. Co. et al., 142 Pa. Superior Ct. 470.

The limited scope of the review of the court of common pleas in proceedings such as this is discussed and clearly defined in the case of Pennsylvania Labor Relations Board v. Kaufman Department Stores, Inc., 345 Pa. 398, in which the Supreme Court, referring to the Pennsylvania Labor Relations Act of 1937, states that (p. 399) :

"The amendatory Act of June 9, 1939, P. L. 293, sec. 9($b$), provides that 'the findings of the board as to the facts, if supported by substantial and legally credible evidence, shall . . . be conclusive'. This means that it is the function of the board not only to appraise conflicting evidence, to determine the credibility of witnesses, and to resolve primary issues of fact, but also to draw inferences from the established facts and circumstances: National Labor Relations Board v. Nevada Consolidated Copper Corporation, 62 Sup. Ct. 960; Agwilines, Inc., v. National Labor Relations Board, 87 Fed.(2d) 146, 151; National Labor Rela-

tions Board v. Moore-Lowry Flour Mills Co., 122 Fed.(2) 419, 422. Upon judicial review, however it is the duty of the court to determine whether the findings of the board are supported by the substantial and legally credible evidence required by the statute and whether the conclusions deduced therefrom are reasonable and not capricious. All orders and decrees of legal tribunals, including those of administrative boards and commissions, must be supported by evidence sufficient to convince a reasonable mind to a fair degree of certainty; otherwise our vaunted system of justice would rest upon nothing higher than arbitrary edicts of its administrators. 'Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion': Consolidated Edison Co. v. National Labor Relations Board, 305 U. S. 197, 229. 'Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established': National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U. S. 292, 300. 'The rule of substantial evidence is one of fundamental importance and is the dividing line between law and arbitrary power': National Labor Relations Board v. Thompson Products, Inc., 97 Fed.(2d) 13, 15; National Labor Relations Board v. Union Pacific Stages, Inc., 99 Fed.(2d) 153, 177. 'Suspicion may have its place, but certainly it cannot be substituted for evidence': Union Trust Co. of Pittsburgh's Petition, 342 Pa. 456, 464; 20 A. 2d 779, 782."

In Union Trust Company of Pittsburgh's Petition, 342 Pa. 456, in which the Supreme Court affirmed the lower court upon excerpts from its opinion, it was held that (p. 461):

" 'We [the court] must, therefore, determine whether the evidence depended upon to support the order is substantial and legally competent, keeping in mind the definition of "substantial evidence" as set forth in

N. L. R. B. v. Columbian, etc., Co., 306 U. S. 292, 299, 300, that "substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion', . . . and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.' " "

In the case of In re Ewart et al., 42 D. & C. 307, it was well said that (p. 314) :

" 'Every reasonable doubt must be resolved by us in behalf of the administrative action, lest we arrogate to ourselves the functions of legislator and administrator. We are mindful that Mr. Justice Stone [the present chief justice] recently felt compelled, in a dissenting opinion, to say of courts that "the only check upon our own exercise of power is our own sense of self-restraint. For the removal of unwise laws from the statute books appeal lies not to the courts but to the ballot and to the processes of democratic government . . . Courts are not the only agency of government that must be assumed to have capacity to govern": United States v. Butler et al., etc., 297 U. S. 1, 79, 87 (1936).' "

In the light of the foregoing principles our review is limited solely to ascertain whether the action of the board was based upon substantial and legally credible evidence or inferences fairly deducible therefrom. If this is the fact, even though an independent consideration of the evidence would lead us to a different conclusion, the decision and order of the board must prevail. Upon a petition for review, a court cannot substitute itself for the board as a fact-finding body or determine the credibility of witnesses where the evidence is contradictory, or do other than ascertain whether the findings and order of the board were based upon substantial and legally competent evidence and

that the inferences drawn by the board were fairly deducible therefrom.

The Pennsylvania Labor Relations Act, sec. 8, subsec. (e), 43 PS §211.8, provides that:

"No findings shall be made on the basis of evidence relating to acts which occurred prior to the original passage of this act."

Section 8 (c) prescribes the practice before the board and provides that if the board shall determine that any person named in the complaint has been engaged in or is engaging in any unfair labor practice "the board shall state its findings of fact, and issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such reasonable affirmative action, including reinstatement of employes discharged in violation of clause (c) of subsection (1) of section six of this act, with or without back pay, as will effectuate the policies of this act".

The National Labor Relations Act of July 5, 1935, 49 Stat. at L. 453, 29 U. S. C. A. §160, contains no prohibition against findings of fact based upon evidence relating to acts occurring prior to the original passage of that act.

The greater number of the findings of fact by the board in this case are based upon evidence of acts occurring prior to June 1, 1937. Specific objections were made to all testimony relating to events occurring prior to June 1, 1937, on the ground that such testimony was not relevant. Counsel for the union agreed that violations of the act, if any, to justify any order of the board must be shown to have occurred subsequent to June 1, 1937, but took the position that the establishing of certain conditions and the occurrence of certain events prior to June 1, 1937, had a bearing on intentions and events occurring subsequent to June 1, 1937.

We cannot find any reported decision of a lower or appellate court interpreting section 8, subsection (e)

as absolutely prohibiting the board from making findings based upon evidence relating to acts occurring prior to June 1, 1937, and, in view of our conclusions, it is not necessary to pass upon or decide this particular question.

If this testimony is at all admissible and if findings of fact by the board can be made thereon it would be merely because such testimony and findings of fact were of historical import only. In considering this particular matter in the case of Labor Relations Board v. Union Trust Co., 89 Pitts. L. J. 343, decided July 31, 1940, the court stated (p. 349):

"An examination of the findings which appear to be pertinent to the 'company-domination' phase of the case leads to the conclusion that those to which specific objection have been taken and which relate to occurrences prior to the effective date of the labor relations act are of historical import only. Otherwise, nothing therein can be considered. The order of the board must be supported by findings that the petitioner engaged in unfair labor practices subsequent to the passage of the labor relations act. We do not believe that the petitioner has been prejudiced by any findings which merely describe conditions existing prior to the effective date of the act."

Upon appeal to the Supreme Court the judgment was affirmed upon a portion of the opinion of the lower court, in which that part of the opinion quoted above was omitted, and no reference thereto was made by the Supreme Court: Union Trust Company of Pittsburgh's Petition, 342 Pa. 456.

It becomes necessary to analyze the testimony to determine whether the board's findings of fact to which objections are made were not only supported by substantial and legally credible evidence but whether the conclusions and order of the board were based upon evidence and findings of fact as to matters which occurred subsequent to June 1, 1937.

The company filed exceptions to Findings of Fact Nos. 11, 12, 13, 14, 15, 16, 17, 32, 34, 35, 36, 37, 38, 39, 40, 41, 43, 46, 48, 49, 50, 51, 54, 55, 56, 57, 58, and 87, because they were based on evidence of acts occurring prior to June 1, 1937, and to Findings of Fact Nos. 18, 28, 29, 30, and 31, not only because they were based on evidence of no probative value, on hearsay evidence, but also on inadmissible evidence, viz, a copy of an opinion of the National Bituminous Coal Labor Board, because the act of Congress under which this board was constituted was declared unconstitutional by the United States Supreme Court. These exceptions will be considered as a whole.

From the testimony and the record it appears that the company owned and operated what was known as a captive mine in Jefferson County, Pennsylvania, referred to in the testimony as the Weisner Mine, and had been operating this mine for a period of approximately twenty years. The superintendent of the mining operations was Joseph Mayes, and the directing head was Joseph Williams, vice president of the St. Marys Sewer Pipe Company. The entire output of the mine was used by the company at its manufacturing plant located in St. Marys, Elk County, Pennsylvania, and no part of the output was sold to the public. Prior to June 1933 the employes of the company working at the mine were not members of any union, but in that month they became members of the United Mine Workers of America, District No. 2, and attempted to cause that organization to be recognized by the company as their representative for the purpose of collective bargaining. The company refused to recognize the union. In August 1933 the employes called and participated in a wildcat or unauthorized strike, which was ended on September 29, 1933, when the employes returned to work. Subsequent to this strike, at various times the representative or representatives of the union attempted to cause the company to recognize

them as the authorized representatives of the employes for the purpose of collective bargaining, but the company at all times refused to recognize the union or to discuss the matter of collective bargaining or the matter of an agreement between the company and the union. The company did not refuse to deal directly with its own employes but it steadfastly refused to deal with representatives of the union. On and prior to October 6, 1934, the company employed approximately 41 persons at the Weisner Mine, and on October 6, 1934, Joseph Mayes, the superintendent and mine foreman, individually notified a number of the employes that the mine was shutting down indefinitely. One of the employes, Merle Coleman, was directed to haul out all the coal that was loaded because the mine was going to close down and was informed by Joseph Mayes that it was an indefinite closing; that he (Mayes) did not know for how long; also, Mayes notified Mervin Kennedy to have everything dumped off the tipple and the tipple cleaned because that would be the last day the employes would be working for some time. Other particular employes were told to properly prop up their places in the mine, and the blacksmith was directed to take his tools out of the mine by Mr. Mayes, because he (Mayes) did not know just when the mine would be worked again. Operations at the Weisner Mine were actually suspended on October 6, 1934.

Prior thereto, on or about July 30, 1934, a complaint had been filed by the United Mine Workers of America before the National Bituminous Coal Labor Board. A hearing was held on October 9, 1934, as a result of which the board ruled on October 10, 1934, that the company had not fulfilled the obligations required by article V(a) of the Code of Fair Competition for the bituminous coal industries, because the company did not meet with the fully accredited representatives of the workers for the purpose of negotiations, and further that in the operation of the mine

the management must meet with the chosen representatives of the workers and in good faith negotiate with these representatives in collective bargaining called for in article V of the coal code.

Findings of Fact Nos. 28, 29, 30, 31, 32, 34, and 35 refer particularly to the hearing before and the opinion of the National Bituminous Coal Labor Board with special reference to the findings in the opinion of the coal labor board.

After October 6, 1934, the mine was not operated, although the company was willing to meet and deal with a committee composed only of men who had worked at the mine and who would represent the employes for the purpose of collective bargaining, but the company still refused to deal with or recognize the union as the accredited representative of the men. During August 1935 work was resumed at the mine, but when the former employes ascertained that the company would not enter into any agreement with the union a number of the former employes refused to work although given the opportunity to do so, and the premises were picketed by a number of men who had worked at the mine prior to October 6, 1934, and who are named in the complaint filed in this case. This situation arose because the mine was being operated in August 1935 as a nonunion mine and the employes refused employment and to work for the company solely because the mine was not a union mine and the union was not recognized by the company. The operation of the mine in August 1935 continued only for approximately eight or ten days with a total force of about eight men, and ceased operations because a sufficient working force could not be obtained. Thereafter some efforts were made by the representatives of the union to have a meeting with Mr. Williams, but the company still refused to enter into negotiations with the union for a collective bargaining agreement.

The mine remained closed until October 3, 1938, when it again commenced operations and since then has been operating as a nonunion mine. Of the employes who resumed work on or shortly after October 3, 1938, only eight thereof had worked at the mine prior to the closing on October 6, 1934.

There is nothing in the record to show that prior to June 1, 1937, there ever had been any written contract or any controversy between the employes and the company as to wages, hours or conditions of employment. The only question at issue between the company and the employes was the recognition of the union and the efforts of the employes to compel the company to sign a collective bargaining agreement with the United Mine Workers of America as their representative.

Prior to June 1, 1937, the refusal of the company to recognize the union, even though all of its employes were members of the union, and to enter into a collective bargaining agreement with the union was entirely lawful. The position of the company that it would deal only with a committee of its own employes and not with the officials of the union was in 1934, and until June 1, 1937, entirely legal. In 1934 and prior to June 1, 1937, there was no legislation defining the terms "unfair labor practice", "current labor dispute", or "employes", that is, who was an employe or when the employment of an employe ceased or was terminated. Whether a labor practice was unfair or not depended entirely upon the viewpoint and opinion of the person who used that expression because no legal definition existed. Nor was there any legislation which made it mandatory for the company to bargain collectively with any representatives whom the employes selected if the company did not wish to do so.

However, the company did not refuse to bargain collectively with its employes. It was willing at all times to meet and deal with a committee of its own employes. The difficulty was that the employes would not

choose their own committee but insisted that the committee be composed of officials of the United Mine Workers of America, and, in view of the attitude taken by the employes in August 1935 when the mine was attempted to be opened, the additional prerequisite was that of a closed shop; that is, the employes would not work in the mine unless all the employes were members of the union, and the representatives of the union were recognized as a committee for the purpose of collective bargaining.

Each side was definitely within its legal rights prior to June 1, 1937. There was no violation of any law by either party; there was no unfair labor practice and there was no refusal by the company to bargain collectively with a committee of its own employes. The employes had the right to insist that the company deal with persons who were not employed by it as representing them and the company had the equal right to refuse to do so.

The record shows that the company did not care whether the employes belonged to the union or not. It did not discriminate against the men who belonged to the union; in fact practically all of the employes did belong to the union. The employes had the right to refuse to work or be employed if the company did not recognize the union. The company had the right to refuse to recognize the union. The only point at issue was the recognition of the union because the record does not show that the employes at any time raised any question as to wages, hours, or conditions of employment.

When an attempt was made to reopen the mine in August 1935 after it had been closed for a period of approximately ten months, the men who had been employed in October 1934 were offered employment. They refused this employment because the mine was to be operated as a nonunion mine, and, as found by the

board, a number of pickets were members of the union who had been previously employed at the mine.

Collective bargaining, as it is defined in the labor relations act, had nothing to do with the controversy existing from October 1934 until June 1, 1937. The sole question in issue was not the refusal on the company to bargain collectively with its own employes but the refusal of the company to recognize the union and the refusal of the men to work because the mine was being operated as a nonunion mine. In August 1935 the company had the legal right to employ only those whom it desired to employ, which included the right to refuse employment to any of the former employes as of October 6, 1934. It also had the right which, however, it did not exercise, to refuse to employ any man who was a member of the United Mine Workers of America. By the same token, the employes had the legal right to refuse employment or to work unless the union was recognized and they had the right to insist that no man be employed who was not a member of the union.

In Kraemer Hosiery Co. et al. v. American Federation of Full Fashioned Hosiery Workers et al., 305 Pa. 206, the Supreme Court declared that (p. 214):

"Plaintiff [company] had exactly the same right to refuse to employ union members, whether for a definite or an indefinite term, as its employes had to refuse to enter its employ for such term, except as members of the union. Plaintiff [company] had the same right unless controlled by a contract, to refuse to continue in its employ those who had become union members, as its employes had to refuse to continue in its employ unless it discharged all but union members."

Substantially the same ruling was made by the United States Supreme Court in Hitchman Coal & Coke Co. v. Mitchell et al., 245 U. S. 229, 38 Sup. Ct. Rep. 65, 62 L. Ed. 260.

The determining question in this case is whether the employes who participated in the wildcat strike in

1933, and who were working at the mine when it closed down on October 6, 1934, and who refused to work in August 1935 were actually employes on October 3, 1938, when the mine resumed operations. Can it be said that the men who were employed in October 1934 and who refused employment in August 1935 were still employes on October 3, 1938, with whose representatives collective bargaining was refused by the company, and if not, was the union the accredited representative of the persons employed on October 3, 1938, and who were working at the mine in 1941? A determination of the question of the relationship of employer and employe also is decisive of the further question as to whether there was a "current labor dispute" on October 3, 1938.

No order can be made by the board based upon evidence and findings of fact as to events which occurred prior to June 1, 1937, and unless there is substantial and legally credible evidence or inferences fairly deducible therefrom to justify the conclusion of the board that the men who refused to work and actually picketed the mine in August 1935 retained their status as employes until October 3, 1938, there is no justification for an order so finding.

The board in its final decision and order on April 21, 1941, states that the findings based on evidence relating to acts occurring prior to June 1, 1937, were made to evaluate properly the present practices of the company and that they tend to show the "length of service and continuity of employment of the various employes, etc", and were the establishing factors of the labor dispute shedding light on and explaining the acts of the company subsequent to June 1, 1937; that the findings relating to the decision of the National Bituminous Coal Labor Board were made for the purpose of describing conditions as they existed at the time of that decision, viz, October 10, 1934. The board, however,

states that no conclusions or order were predicated upon either evidence of acts occurring prior to June 1, 1937, or upon the opinion of the National Bituminous Coal Labor Board. The opinion and findings of the National Bituminous Coal Labor Board were inadmissible and are of no probative value whatever. The act of Congress under which that tribunal was established has been declared unconstitutional by the United States Supreme Court (Carter v. Carter Coal Co. et al., 298 U. S. 238, 80 L. Ed. 1160), and therefore its judgment or opinion cannot be regarded as res adjudicata or as evidence which is competent or relevant. A judgment to be competent evidence must be a valid judgment rendered by a court having jurisdiction over the parties and over the subject matter, or as stated in section 7 of the A. L. I. Restatement of the Law of Judgments:

"A judgment is void if it is not rendered by a court with competency to render it."

It cannot be regarded as res adjudicata because if a judgment is res adjudicata it is essential that it be a valid and not a void judgment, and where the judgment is void for want of jurisdiction, whether of the subject matter or of the person, it is of no effect whatever as an estoppel or as evidence: 34 C. J. 768, §1183; 32 C. J. S. 479, §629.

While the board held that the shutting down of the mine indefinitely on October 6, 1934, did not terminate the employment of the men, yet it did not discuss, except very briefly, the effect of the refusal of the men to work in August 1935 when the company attempted to resume operations of the mine. The board held that the "strike" which was called in August 1935 was merely a cessation of labor and not a termination of employment.

If it is admitted for the sake of argument, that the shutting down of the mine indefinitely on October 6, 1934, which the company had a legal right to do, did not terminate the employment or operate as a discharge of

the men from employment, yet the situation becomes different when one considers the effect of the attempt to operate the mine in August 1935. At that time the company offered employment to all of the persons named in the complaint. Only a few of them, possibly eight or ten, were willing to work. All of the others absolutely refused employment or to work because the company would not recognize the union. The men were within their legal rights in so refusing employment but the legal effect of this refusal was to terminate the relationship of employer and employe between the company and the former employes, if in fact that relationship existed in August 1935. This occurred almost two years prior to the passage of the Labor Relations Act on June 1, 1937, and there was no legal duty resting either upon the company or upon the men to continue their employment. The sole effect of this refusal of the men to work was that they were willing to regard themselves as unemployed by the company and therefore if the relationship of employer and employe had existed from October 1934 until August 1935, it terminated absolutely when the men refused the offer of the company to return to work. This would be so even though the company gave to the men no formal notice of discharge: See Dail-Overland Co. v. Willys-Overland, Inc., et al., 263 Fed. 171.

However, the board found that a strike was called in August 1935 and bases this conclusion upon the testimony of various witnesses. An examination of the testimony of these witnesses shows that no one of the few men who were actually working in the mine in August 1935 went out on strike. It is true that the representative of the union upon learning that work was attempted to be resumed in August 1935 called a "strike" but the following analysis of the testimony of the various witnesses shows that no person actually

working at the mine ceased work and joined the so-called strike.

John Milliren testified that the men who were actually working in the mine did not strike. Harry Neal was not working in August 1935, although he went on the picket line. Charles Shick stated that no one on the picket line in 1935 worked at the mine at any time during that year. Carl Mottern was on the picket line but had refused to return to work and testified that none of the men who were working at the mine in 1935 went out on strike. Frank Reed stated that no person who participated in the so-called strike in 1935 worked for the company during that year, and other witnesses testified to the same effect. The question thus arises whether the strike which was called by Levi McConnaughey, who was the collective bargaining representative of the United Mine Workers of America, was in reality a strike as that term has been defined.

In Uden v. Schaefer et al., 110 Wash. 391, 394, 188 P. 395, 11 A. L. R. 1001, the court in construing the expression "so-called strikes" in a surety bond, held that it was not a strike if workmen refuse to enter into the employment of a particular contractor. "A 'strike', in such common acceptation, is the act of quitting work by a body of workmen for the purpose of coercing their employer to accede to some demand they have made upon him, and which he has refused . . ." or as stated in Longshore Printing Co. v. Howell et al., 26 Ore. 527, 38 P. 547, 28 L. R. A. 464, a strike is defined as (p. 541) " 'the act of quitting work; specifically, such an act by a body of workmen, done as a means of enforcing compliance with demands made on their employer' ". It is applied commonly to a combined effort on the part of a body of workmen employed by the same master, to enforce a demand for higher wages, shorter hours, or some other concession by *stopping work in a body at a prearranged time,* and refusing to resume work until the demanded concession shall have been

made. And possibly the clearest definition is that in Walgreen Co. v. Murphy, Director of Labor et al., 386 Ill. 32, 53 N.E. (2nd) 390, in which it is stated that a strike is a stoppage of work by common agreement of working men. See also U. S. Coal Co. v. Unemployment Compensation Board of Review, 66 Ohio App. 329, 32 N. E. (2nd) 763.

There was no stoppage of work by common agreement in August 1935 at the Weisner Mine. The representative of the union and the men may have termed the action taken at the meeting of the union members a "strike" but no real strike occurred at that time, because the record shows that no persons or workmen then employed and working in the mine actually went out on strike in a body at a prearranged time.

Prior to June 1, 1937, it is true that ordinarily when a stoppage of work by a combined group of workers occurred and there was therefore a strike, such strike was merely a cessation of labor and did not, until some affirmative action was taken by the employer, amount to a severance of the relation of employer and employe. However, here there was no strike and even if there was a relationship of employer and employe from October 1934 until August 1935, such relationship absolutely ceased and was terminated by the refusal of complainants to return to work when the company offered to reopen the mine and employ them. Therefore there is no presumption of a continuance of the relationship of employer and employe from August 1935 until October 1938 when the mine was reopened and work resumed.

In order to affirm the judgment of the board it is necessary for the complainants to establish a jurisdictional fact, viz, that complainants were actually employes of the company in October 1938 when the Weisner Mine resumed operation. We hold that this status terminated at least in August 1935 when the

employes were offered work and refused to accept employment. In view of this conclusion, it is not necessary to consider whether complainants had regular or substantially equivalent employment within the meaning of the labor relations act from August 1935 to October 3, 1938.

Having concluded that complainants were not actually employes of the company in September or October 1938, when the Weisner Mine resumed operations, the important remaining question is whether the company was guilty of an unfair labor practice in refusing employment to complainants, with the exception of Edward Hutchins, because of their affiliation with or membership in the United Mine Workers of America. In determining whether or not there is the substantial and legally credible evidence required by the act to support the findings of the board that complainants were refused employment in September or October 1938, because of their union affiliations, the court can look only to the evidence favorable to the findings. The court has no authority, under the act, to appraise conflicting evidence, to determine the credibility of witnesses, to resolve primary issues of fact or draw inferences from established facts and circumstances. These are the sole functions of the board. The evidence to support these findings is in conflict and therefore it was the sole duty of the board to appraise and reconcile the conflicting evidence.

When the mine resumed operations in October 1938, eight of the former employes who were members of the union were employed and were working at the mine at the time the complaint was filed and the hearing was held. The remainder of the men employed in September or October 1938 were not members of the union.

On October 20, 1937, which was after the enactment and effective date of the Pennsylvania Labor Relations Act of June 1, 1937, Mr. Joseph A. Williams, the vice

president and general manager of the company, wrote a letter to Joseph Mayes, superintendent and mine foreman of the Weisner Mine, which was offered in evidence as complainant's Exhibit No. 11, apparently in answer to a letter received from Mr. Mayes. In this letter Mr. Williams stated:

"Dear Joe:

"We have your letter and do not know of anything new. Any time the men, you speak of, really want to and are willing to work, we, of course, will be ready to start up, but the first move they would have to make would be to get together and elect representatives to deal with us, so that they would have their own organization, then when the other fellow barges in, we could handle the situation very nicely.

"If there is enough of them who want to work and follow along this line, we will only be too glad to co-operate with them."

There was testimony before the board that when this letter was received by Mr. Mayes he discussed it at a meeting with a number of these complainants, showed the letter to them and asked their opinion with relation thereto, and the complainants who were present at this meeting told Mr. Mayes in effect that they would not accept the conditions laid down therein and that there was "nothing doing".

There was also testimony that Mr. Mayes had told some of the complainants when they applied for work, that the company would have nothing to do with the union or the C. I. O., the United Mine Workers of America being affiliated with the C. I. O., and that the mine would be opened without signing any contract with the C. I. O.; that Mr. Mayes inquired of Merle Coleman if he was taking orders from Levi McConnaughey, who was an organizer of the United Mine Workers of America, and stated to him there would be no contract signed with the United Mine Workers of

America, and if he was taking orders from Levi Mc-Connaughey he would not be employed, or words to that effect. Later, on September 20, 1938, a meeting was held between Mr. Williams and a number of the former employes of the company. The men then requested permission to resume work at the mine when it was reopened, to which request Mr. Williams stated in effect that the mine would resume operations, that new men had been employed but they would be considered in the future if there were openings for them. Mr. Williams testified he made no statement at this meeting to the effect that the company would have nothing to do with the union, its representatives or with the C. I. O., that he stated to the former employes that membership or nonmembership in a union would not prevent them from obtaining employment with the company, and that union and nonunion workers would be paid and treated the same with no preference being shown to either. However, the board drew from the letter of October 20, 1937, the inference that the expression "then when the other fellow barges in we could handle the situation very nicely", referred to the United Mine Workers of America, upon the theory that "the other fellow" meant only the union and its representatives.

The wording of this letter is unfortunate and the expression "when the other fellow barges in we could handle the situation very nicely", does justify the inference which the board found, viz, that "the other fellow" meant the United Mine Workers of America. This, together with the other testimony before the board is the substantial and legally credible evidence required by the act to support the findings that the company refused to employ complainants because of their union membership, with the exception of Edward Hutchins and of the other eight men reëmployed. Since it is the sole function of the board to pass upon conflicting evidence and the credibility of witnesses, the court is with-

out authority to disturb these findings even if our independent findings would differ from those of the board.

The question then resolves itself into whether or not, after the enactment of the Pennsylvania Labor Relations Act of June 1, 1937, the refusal to employ a person solely because of membership in a union is an unfair labor practice.

When the final decision and order of the board of April 21, 1941, was issued it had been held in two cases, National Labor Relations Board v. National Casket Co., Inc., 107 F. (2d) 992, and Phelps Dodge Corp. v. National Labor Relations Board, 113 F. (2d) 202, that it was not an unfair labor practice to refuse to employ an applicant for work because of his union membership. The National Casket Company case has never been reviewed by the United States Supreme Court, but the Phelps Dodge Corporation case was reviewed by that court, and an opinion handed down on April 28, 1941: 313 U. S. 177; 61 S. Ct. 845; 85 L. Ed. 1271; 133 A. L. R. 1217. The Supreme Court, while stating that the statute does not touch the exercise of the right of the employer to select its employes or to discharge them, and does not impose an obligation on the employer to favor union members in hiring employes, and that the employer is as free to hire as he is to discharge employes, held that the statute was directed solely against the abuse of that right by interfering with the countervailing right of self-organization.

In that case there had been a strike on June 10, 1935, which continued until August 24, 1935, when the strike terminated. During the strike the National Labor Relations Act of July 5, 1935, became effective. A number of men who had been on strike were refused employment because of their affiliation with the union. Of these men two had ceased to be in the corporation's employ before the strike but sought employment after the close of the strike. The Supreme Court held that it

was an unfair labor practice to refuse employment to these two applicants because of their affiliation with a union and reversed the lower court in that respect. We are bound by the decision of the United States Supreme Court in the Phelps Dodge case, and therefore are obliged to hold that the refusal to employ complainants because of their union membership was an unfair labor practice on the part of the company.

There is no doubt that an employer may lawfully decline to employ an applicant who is a member of a union and that he may discharge a union man for proper cause. The statutory test is whether the applicant was rejected or the employe discharged on account of union membership or activities, or on account of some permissible criterion: National Labor Relations Board v. Waumbec Mills, Inc., 114 F.(2d) 226.

Because of the limited nature of the judicial review and the fact that there is substantial and legally credible evidence, the exceptions to the findings and order of the board that the complainants were refused employment because of their union affiliations are dismissed with the modification of the order as hereinafter set forth. For the same reason and for reasons heretofore stated, exceptions nos. 3, 4, 5, 6, 7, and 8 are dismissed. Exceptions nos. 9, 10, and 13 are sustained because we have found that the employment of the persons named therein by the company terminated at least in August 1935, and that all of these persons with the exception of the eight specifically named were at no time after August 1935 employes of or in the employment of the company. Exception no. 11 is dismissed because in holding that the persons named therein were not employes of the company after August 1935 it is not necessary to decide whether they had procured other regular and substantially equivalent employment.

Exception no. 12 alleges error in the conclusions of the board nos. 2, 4, 5, 7, and 8. Having found that the

persons named in conclusion no. 3 were not employes of the company on September 20, 1938, and not after August 1935, this conclusion is set aside because it is not supported by substantial and legally credible evidence. There is no substantial or legally credible evidence to warrant conclusions nos. 7 and 8, because there is no testimony whatever that the United Mine Workers of America on September 20, 1938, or subsequent to October 20, 1937, was the representative designated for the purpose of collective bargaining by a majority of the employes of the company, or that the company did refuse to bargain collectively with this union as the representative of its employes after October 20, 1937, or on or about September 20, 1938. Therefore, these conclusions are set aside.

As to conclusions nos. 4 and 5 they are supported by substantial and legally credible evidence, although they are not properly stated. In conclusion no. 4 the words "the said employes" and the name of Edward Hutchins should be eliminated and in lieu thereof the words "the said former employes who were applicants for reëmployment" should be inserted. In conclusion no. 5 the words "in regard to hire, tenure, terms and other conditions of employment" should be eliminated and in lieu thereof the words "applicants for reëmployment" should be inserted.

Exception no. 14 goes to paragraphs 1, 2, 3, and 4, of the order issued by the board. Sections 1 and 2 of the order are set aside because they are not based upon findings of fact supported by substantial and legally credible evidence and are not proper conclusions of law. There is no evidence whatever in the record to show that in September 1938 or subsequent thereto the company interfered in any respect with its then employes in the exercise of their right to self-organization, or that the company discouraged membership in the United Mine Workers of America, or any other labor

organization by discriminating against its then employes in regard to hire, tenure, terms or conditions of employment. If the facts in this case had been similar to those in the cases of National Labor Relations Board v. Sunbeam Electric Mfg. Co., 133 F.(2d) 856, and National Labor Relations Board v. Standard Oil Co. et al., 138 F.(2d) 885, sections 1 and 2 of the order would be proper. In those two cases the employes were actually employes whereas in the instant case the complainants were not employes.

Paragraph 3 of the order is likewise set aside because there is no evidence to show that the United Mine Workers of America was the designated representative of the persons employed by the company in September 1938 or subsequent thereto for the purpose of collective bargaining in respect to rates of pay, wages, hours or other conditions of employment. Any refusal of the company to bargain collectively with the United Mine Workers of America as the representative of its employes prior to June 1, 1937, was not an unfair labor practice and there is no finding which supports even an inference that the union requested collective bargaining after June 1, 1937, when the act went into effect. There could be no violation of the act by the company after June 1, 1937, in respect to collective bargaining with the union as the representative of the company's former employes (complainants), because complainants were not employes of the company after August 1935.

Paragraphs 4(a), 4(b), and 4(c) are modified so as to read:

"(a) Prepare and post in conspicuous places readily accessible to employes at its Weisner Mine in Ringgold Township, Jefferson County, Pennsylvania, a preferential list of all its former employes who were applicants for reëmployment on or prior to September 20, 1938,

according to their seniority and including particularly the names of Charles Alcorn, Richard Beers, Samuel Beers, Clair Bush, Frank Bush, Merle Coleman, Clair Dobson, Horace Hinderliter, Kermit Hinderliter, Marvin Kennedy, Melvin Mayes, Robert Mayes, Sylvester Mayes, Russell Martz, John H. Milliren, Carl Mottarn, Harry Neal, William Plyler, Carl Raybuck, Frank Reed, Irvin Reitz, Charles Shaffer, Charles Shick, Ernest Shick, Ross Smathers, Marion Smith, Olan Snyder, George Watkins and Norman Wolfgang, who were members of the United Mine Workers of America, District No. 2.

"(b) Offer immediate employment or reinstatement, in accordance with their position on the aforesaid preferential list, to as many of the said former employes who were applicants for reëmployment on and prior to September 20, 1938, and who were members of the United Mine Workers of America, District No. 2, as the condition of its work presently permits, without prejudice to all rights and privileges previously enjoyed by them, dismissing or laying off, if necessary, any or all of the employes hired on or about September 20, 1938, and thereafter;

"(c) Offer employment or reinstatement to such former employes who were applicants for reëmployment on or prior to September 20, 1938, who were members of the United Mine Workers of America, District No. 2, and for whom employment may not be presently available, to their former positions, without prejudice to all rights and privileges previously enjoyed by them, when and as soon as such employment is available and before hiring any other person or persons whose name or names do not appear on the said preferential list."

### Decree

And now, August 28, 1945, paragraphs 1, 2, and 3 of the final order of the Pennsylvania Labor Relations Board are set aside and paragraph 4 of the final order, as modified by the foregoing opinion, is affirmed.

And now, August 28, 1945, St. Marys Sewer Pipe Company, United Mine Workers of America, District No. 2, and Pennsylvania Labor Relations Board each except to the foregoing decree and at their respective requests an exception is granted and bill sealed in each of their behalf.